FILED & ENTERED

APR 09 2014

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Gonzalez DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SAN FERNANDO VALLEY DIVISION

In re:

Ateco Inc

                                    Debtor(s).

ATECO, Inc

                                    Plaintiff(s),

        v.

John F Hebb

                                    Defendant(s).

CHAPTER 11

Case No.:  1:10-bk-22623-MT
Adv No:   1:11-ap-01198-MT

**MEMORANDUM OF DECISION RE TRIAL ON (1) VALIDITY OF LIEN; AND (2) DISALLOWANCE OF CLAIM NO. 4-1**

Date:        November 1, 2013
Time:        10:00 a.m.
Courtroom:   302

Ateco, Inc ("Debtor") was a manufacturer of attachments for heavy equipment machinery, once shipping its proprietary products around the U.S. and the globe.  Its journey to vindicate a relatively simple breach of contract, misappropriation of trade secrets and licensing agreement dispute should have been a straightforward, well defined path through the California state courts, ending in a speedy resolution allowing the company to return its focus to machinery research and development rather than litigation.  Because Ateco initially hired John Hebb to litigate a trademark infringement dispute, Ateco's odyssey has instead come to look more like Joseph K.'s strange trip through the legal system in Franz Kafka's *The Trial* rather than any

appropriate dispute resolution in the American justice system.  Just as Joseph K. never really knew why he had been arrested, Ateco has been incapable of resolving a simple fee dispute for almost 10 years.  After lengthy trips through two California Superior Court actions, a California appellate action, a bankruptcy case, three separate appeals to the Bankruptcy Appellate Panel and the Ninth Circuit Court of Appeals, and, lastly, this trial, Hebb has never presented a coherent theory for why Ateco owes him any further attorney fees.  This lengthy memorandum, combined with previous rulings in the case, detail the alternative reality forced on Ateco and this Court by the constant stream of baseless legal pleadings produced by claimant Hebb.

**Background Facts**

Sometime in December 2002, Ateco, by its president Peter Petrovsky (referred to hereinafter as "Petrovsky," in his capacity as president of Debtor), retained the services of the Law Offices of John F.L. Hebb ("Hebb") to represent it in a Ventura County Superior Court case entitled Ateco Inc. v. Hales, et al. ("the Hales Litigation").    In the Hales Litigation, Ateco sought damages for breach of contract, misappropriation of trade secrets, and conversion.  The retainer agreement provided for an hourly rate of $225 for Hebb, and included a paragraph that Hebb would claim a lien on the proceeds of any settlement.

Sometime in February 2004, Debtor then retained a separate law firm ("the Hathaway firm") to represent it in the Hales Litigation.  After attorney Alejandro Gutierrez ("Gutierrez") of the Hathaway firm began his representation of Debtor, Hebb continued as counsel for Debtor as well, although in what capacity is in dispute.  The extent and quality of work done by Hebb is disputed, but not material to this decision.[1]

Judgment was ultimately entered in favor of Debtor in the Hales Litigation in the sum of $333,743 in compensatory damages, and $159,000 in punitive damages.  Hebb claimed that Debtor was awarded an additional $1,006,354 for attorney fees in addition to these damages, but has not substantiated this claim.

---

[1] Ateco alleged as part of the summary judgment motion that Hebb was not properly representing it, citing two complaints dismissed by demurrer and the expert opinion of attorney James King.  While Ateco's position explains its desire to retain new counsel, it has not been necessary to reach the merits of this fact-intensive inquiry.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

After the judgment was entered in Debtor's favor, Gutierrez and Hebb filed separate motions for attorney's fees.  Gutierrez requested $334,276.50.  Hebb requested $510,873, reflecting an increase to $300 per hour.  A hearing was held on the motions on December 2, 2005.  At the hearing, Ventura County Superior Court Judge Kellegrew awarded all of the attorney's fees requested by Gutierrez.  After questioning Hebb's fees, however, Judge Kellegrew took Hebb's motion under submission. On February 27, 2006, Judge Kellegrew issued a minute order finding that the reasonable value of Hebb's services to be $200,000, and granted Hebb's motion for attorney's fees in that amount.

Sometime thereafter, Hebb asserted a modified attorney's lien against any payment by the Hales defendant to satisfy the attorney's fee award in the Hales Litigation. Hebb claimed such right under a change in the California law on attorney fees.  Debtor subsequently notified Hebb that it had already paid him approximately $250,000 in attorney's fees, and demanded that Hebb withdraw his claimed attorney lien.  Hebb refused.  Debtor alleges that this refusal to withdraw the lien materially harmed its business, but that issue has been left for another day.

Sometime in 2008, Hebb filed suit against Debtor and its principal, Peter Petrovsky in Los Angeles Superior Court ("the State Court"), and Debtor filed a cross-complaint against Hebb (the "State Court Fee Action").  On August 17, 2010, in advance of trial which was scheduled to begin on September 20, 2010, the parties entered into a stipulation to submit the case to binding arbitration rather than proceed to trial (the "Arbitration Stipulation").  The arbitration did not occur.

**Procedural Posture of the Bankruptcy and Adversary Proceeding**

On October 5, 2010, Debtor filed its chapter 11 petition.  Hebb filed a proof of claim on January 31, 2011, which consisted of a secured claim of $543,822 for unpaid attorney's fees, and an unsecured claim of $1,087,645 for interest and alleged future "tort causes of action."  Proof of Claim 4-1, filed by John Hebb, Ex. J. Debtor filed its Objection to the Hebb Claim on March 1, 2011.  The basis for the objection was that Hebb failed to provide any evidence that he has a valid secured claim, and that Hebb's attorneys fees were reduced by the State Court to $200,000.

On March 17, 2011, Debtor filed an adversary complaint against Hebb, designated as case number 1:11-ap-01198.  The complaint sought to determine the validity of Hebb's asserted lien, to disallow his claim, and asserted affirmative causes of action for breach of fiduciary duty, professional negligence, breach of contract, fraud, and unjust enrichment.

After lengthy proceedings not relevant here, on June 27, 2012, the Court determined that the Federal Arbitration Act did not apply and that Hebb had waived any right he may have had to enforce any arbitration agreement with Debtor (the "OSC Memorandum," ad. pro. doc.no. 34). After a denial of a Motion for Reconsideration, Hebb appealed (the "OSC Appeal") to the Bankruptcy Appellate Panel for the Ninth Circuit (the "B.A.P."). Over the next year, the B.A.P. denied Hebb's Emergency Motion for Stay Pending Appeal and set oral argument on the OSC Appeal for June 20, 2013.

On September 9, 2012, the Court held a hearing on Debtor's Motion for Summary Judgment re Objection to the Hebb Claim. On November 6, 2012, this Court granted summary judgment in favor of Ateco as to its objection to the secured portion of the Hebb Claim, but denied summary judgment as to the unsecured claim for fraudulent inducement.  See Memorandum of Decision re Motion for Summary Judgment, bankr. doc. no. 221.  The secured portion of Hebb's proof of claim was disallowed in any amount above $200,000, as this portion of Hebb's claim was satisfied by Debtor pre-petition.    Further briefing was requested on Hebb's fraudulent inducement claim and a schedule was set for any additional summary judgment motions.

The unsecured portion of Hebb's claim is for damages related to his claim that, on several occasions from and after the December 23, 2004 verdict in the Hales Litigation, Debtor fraudulently induced him to continue to provide legal services with false promises of payment that Debtor never intended to honor.  See Defendant's Trial Ex. C, 9:6-19.  Hebb contended that Debtor consistently promised him that he would pay all of his fees, with interest, if Hebb would agree to forgo payment of the accrued fees until after the resolution of the Hales Litigation. Declaration of John F.L. Hebb as Claimant's Testimony on Direct, 3:1-6.  Hebb believed that Petrovsky concocted a plan sometime in 2005 to induce Hebb to continue to provide his services by promising him future payment of his fees in full.  Hebb believed that Gutierrez and Petrovsky

conspired to induce Hebb to continue to provide services; all while having concealed the condition upon which Petrovsky would pay Hebb in full.  Hebb's Trial Brief, 3:10-17.  Hebb pointed to Gutierrez' decision to submit an attorney fee motion separate from Hebb's and statements at the hearing on both his and Gutierrez' Motions for Attorney Fees, which he believed demonstrated the alleged conspiracy to undercut Hebb's fees.  Declaration of John F.L. Hebb as Claimant's Testimony on Direct, 6:20-27 – 7:1-20.  It is Hebb's position that Petrovsky's promise to pay Hebb was, in fact, a promise conditioned on Hebb's full contractual fees being awarded against the Hales Litigation defendants.  Id.  As best as the Court can understand Hebb's theory, the misrepresentation alleged is twofold: (1) that Debtor's promise to pay his full contractual fees was untrue; and (2) that Debtor concealed the condition upon which the promise to pay was based; that is, Debtor did not disclose to Hebb that he would be paid in full only if his Motion for Attorney's fees was granted in full against the Hales Litigation defendants.

Hebb then filed a pleading on December 19, 2012, wherein he declined to file any motion for summary judgment as to "debtor's fraud and tortious conduct, because such claim involves disputed issues of material fact" and again stating: "a trial will be necessary."  Hebb's Response to Court's 11/6/12 Scheduling Order, (bankr. doc. no. 233).

On March 15, 2013, this Court held hearings on several continued matters, including a motion to dismiss the bankruptcy case filed by Hebb and Debtor's Supplemental Motion for Summary Judgment. Hebb again stressed that, while he was open to mediation, he believed that a trial was necessary.  Supp. Mot. for Summ.J. Hr'g Tr., 26:1-18 (ad. pro. doc. no. 64).

On November 1, 2013, after a failed mediation and several protracted pretrial hearings, the Court conducted a trial on the liability portion of Hebb's claim for fraudulent inducement, reserving the question of damages until a later date.  Exhibits were admitted as noted on the record, except for those that were specifically excluded as a result of pre-trial sanctions issued against Hebb.  See Memorandum of Decision re (1) Hebb Spoliation Motion; (20 Ateco Motion to Exclude Hebb Documents; and (3) Court's Order to Show Cause re Pretrial Compliance, (ad. pro. doc. no. 100).  Petrovsky testified on behalf of Debtor; Hebb testified on behalf of claimant Law Office of John F.L. Hebb.  Petrovsky and Hebb submitted declarations in lieu of direct

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

testimony.  There was extensive cross examination of both witnesses.  No other witnesses were called.

**Factual Findings**[2]

Hebb testified at trial that, after the Hathaway firm associated into the Hales Litigation, Gutierrez insisted that Debtor pay the Hathaway firm's fees monthly.  It was the pressure to pay the Hathaway firm that, along with other costs of litigation, Hebb believed caused Debtor to request that Hebb forgo regular monthly payments.  Instead, Hebb testified that Petrovsky promised on several occasions prior to December 2004 that he would pay all fees when he [Petrovsky] could.  Debtor did make payments to Hebb in the approximate amount of $247,564 from December 2002 through February 2006.

Hebb presented no direct evidence at trial that Petrovsky misrepresented to Hebb that he would pay full contractual fees.  In the emails that Hebb provided as trial exhibits, it is clear that Petrovsky on several occasions questioned Hebb's billing methods and expressed frustration at the erratic timing of the invoices, how difficult the invoices were to decipher, and that there appeared to be no way to verify the entries on the invoices.  See Debtor's Trial Exhibits, Ex. F; H; K; L; S; and T.  These exchanges demonstrate that there was a legitimate disagreement as to Hebb's bills.  As early as December 2003, *before Gutierrez associated into the Hales Litigation*, Petrovsky was requesting clarification from Hebb about his invoices.  Debtor's Trial Exhibits, Ex. D-8.  When Gutierrez associated into the Hales Litigation in February 2004, Petrovsky testified that it was his expectation that Hebb's role would be diminished so that there was no duplication in the work done by the attorneys.  After Gutierrez began working on the Hales Litigation, Petrovsky testified that he did not see the expected decline in Hebb's accruing fees.  Declaration of Peter Petrovsky in Lieu of Direct Testimony, 3:1-18.  In fact, according to Hebb's own records, the bills Petrovsky received after Gutierrez' association into the Hales Litigation show a marked increase in the attorney's fees billed.  Id. at 3:13-18.  Hebb's Deposition, vol. 2, Ex. 12.

---

[2] To the extent any finding of fact is construed to be a conclusion of law, it is hereby adopted as such.  To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.  To the extent any party should later assert that this Court may not hear and determine this matter, that party is required to file written objections pursuant to Fed. R. Bankr. P. 9033, and the following shall be considered proposed findings of fact and conclusions of law should the District Court find this Court lacked authority to enter a final ruling.

1

2    The email communications between Hebb and Debtor show that there was a real dispute

3    over Hebb's fees and an attempt by Petrovsky to understand Hebb's billing methodology.    In

4    March 2005, Petrovsky sent an email to Hebb, reiterating a previous request to receive monthly

5    invoices from Hebb, and complains that there was no way to verify the entries on the "annual

6    bill" that Hebb had tendered.  Declaration of Peter Petrovsky in Lieu of Direct Testimony, Ex.

7    H-1.  Petrovsky states in the same email to Hebb that he will "attempt to make regular payments

8    as I do with Alex" and that Petrovsky would do "the very best [he] can to juggle all of the balls

9    and keep everyone happy." Id.  Hebb's own records show that Debtor received only seven

     invoices in the three years prior to Judge Kellegrew's ruling.    Hebb's Deposition, vol. 2, Ex. 12.

10

11    On September 27, 2005, Petrovsky expressed to Hebb and Gutierrez his concern about

12    the "extreme legal expenses" and stated that before he paid the entire balance, Petrovsky wanted

13    to hear from the Ventura County Court as to the "fairness of the charges." Id., Ex. L-1.

14    Petrovsky felt that it was prudent to take this course because he wanted to be able to "scrutinize

15    the charges in light of the Court's findings." Id.  On October 1, 2005, Petrovsky sent an email to

16    Hebb, wherein he vented his frustration with Hebb's invoice and again requested that Hebb

17    explain how the invoice was calculated.  Id., Ex. F-1.  These statements were not representations

18    that Petrovsky will pay all of the fees Hebb believes he is owed.  Instead, these statements

19    demonstrated that Petrovsky told Hebb all along that he would pay fair and accurate attorney's

20    fees.  Petrovsky stated repeatedly in his email exchanges with Hebb that, "I will be fair" and that

     Petrovsky will "continue to do the best he can." Hebb's Trial Exhibits, Ex. 50 and 59.

21    At trial, Petrovsky gave credible testimony that when he was presented with Hebb's

22    invoices after Gutierrez was retained, he was genuinely confused by how much Hebb was billing

23    him for the Hales Litigation and that Hebb's attempts to explain how the hours were calculated

24    were ineffective.   Petrovsky's testimony about Hebb's inability to fully explain how his bills

25    were calculated is bolstered by Hebb's own admission that neither he nor his support staff tracks

26    their hours on contemporaneous, hourly time sheets.  Hebb's Deposition, vol. 2, 300:7 – 302:22;

27    vol. 3, 516:6-21.  Petrovsky testified that he believed that Hebb's bills were manufactured later

28    in preparation for submission to the State Court for his Motion for Attorney's Fees, and were not

     a true reflection of the time Hebb spent providing effective counsel in the Hales Litigation.  No

evidence has been presented, nor is it credible, that Petrovsky would promise to pay all of the fees that Hebb asserted were incurred, given the repeated issues Petrovsky raised with respect to Hebb's billing practices.

Hebb's theory that Petrovsky's alleged promises to pay all of his attorney's fees were subject to a hidden condition also lacks believability.  From the evidence and testimony presented at trial, Petrovsky did not premise his statements that he would pay fair and accurate bills for Hebb's services on some secret condition that such payment was contingent upon a full award against the Hales Litigation defendants.  Instead, after Gutierrez began working on the Hales Litigation, Petrovsky began to question whether the fees that Hebb was billing Debtor were reasonable.   This doubt was raised because Gutierrez informed Petrovsky that much of what Hebb provided to him was of no value in preparing for trial, and because Gutierrez was garnering results by eschewing Hebb's strategic suggestions.  Declaration of Alejandro Gutierrez in Support of Debtor's Objection to Claim no. 4, 2:15-3:9 (bankr. doc. no. 329); Hebb's Trial Exhibits, Ex. 35, p. 4.  Then, after Petrovsky received one of Hebb's sporadic invoices, Petrovsky's doubts about the reasonableness of Hebb's fees were not kept in the deep recesses of his heart and hidden from Hebb.  These doubts were quite openly shared with Hebb in the emails where Petrovsky asks for explanations of the invoices, and in the September 27, 2005 email where Petrovsky states that "before I pay the entire balance I want to hear from the [state] court as to the fairness of the charges."  Hebb's belief that this was a secret conspiracy is without any basis in reality – the concern both Petrovsky and Gutierrez had with his work and billing was obvious and explicit.

The last payment Debtor made to Hebb was on February 7, 2006.  Hebb's Deposition, vol. 2, Ex. 12.  Judge Kellegrew's ruling on Hebb's Motion for Attorney's Fees was issued on Feb. 26, 2006.  No further payments were tendered thereafter, as Petrovsky got what he felt was confirmation from an independent third party for what he was already inclined to believe: Hebb overbilled him.  As Hebb did not have contemporaneous time sheets to buttress his billing, this was not an unreasonable belief, nor one concocted in an effort to dodge paying Hebb.

**Legal Theory of Claim**

A proof of claim is deemed allowed unless a party in interest objects under § 502(a) and constitutes "prima facie evidence of the validity and amount of the claim" pursuant to Bankruptcy Rule 3001(f). See also FED. R. BANKR.P. 3007. The filing of an objection to a proof of claim "creates a dispute which is a contested matter" within the meaning of Bankruptcy Rule 9014 and must be resolved after notice and opportunity for hearing upon a motion for relief. See ADV. COMM. NOTES TO FED. R. BANKR.P. 9014.  Upon objection, the proof of claim provides "some evidence as to its validity and amount" and is "strong enough to carry over a mere formal objection without more." Wright v. Holm ( In re Holm ), 931 F.2d 620, 623 (9th Cir.1991) (quoting 3 Collier on Bankruptcy § 502.02, at 502-22 (15th ed.1991)); see also Ashford v. Consolidated Pioneer Mort. ( In re Consol. Pioneer Mort.), 178 B.R. 222, 226 (9th Cir. BAP 1995), aff'd, 91 F.3d 151, 1996 WL 393533 (9th Cir.1996). To defeat the claim, the objector must come forward with sufficient evidence and "show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." In re Holm, 931 F.2d at 623.  "If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence." In re Consol. Pioneer, 178 B.R. at 226 (quoting In re Allegheny Int'l, Inc., 954 F.2d 167, 173-74 (3d Cir.1992)). The ultimate burden of persuasion remains at all times upon the claimant. See In re Holm, 931 F.2d at 623.  As Ateco has overwhelmingly rebutted any presumption of validity Hebb's claim had, Hebb had the burden to prove his claim by a preponderance of the evidence.

"The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; […]" Hunter v. Up-Right, Inc., 6 Cal.4th 1174, 1184 (Cal. 1979); Molko v. Holy Spirit Assn., 46 Cal.3d 1092, 1108 (Cal.1988) superseded by statute on other grounds, Scheiding v. Dinwiddie Const. Co., 69 Cal.App.4th 64, 70-73 (Cal.Ct.App. 1999).

"Promissory fraud" is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without

such intention, there is an implied misrepresentation of fact that may be actionable fraud.  Union Flower Market, Ltd. v. Southern California Flower Market, Inc., 10 Cal.2d 671, 676 (Cal.1938).

An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract. Chelini v. Nieri, 32 Cal.2d 480, 487 (Cal.1948)("tort of deceit" adequately pled where plaintiff alleges "defendant intended to and did induce plaintiff to employ him by making promises ... he did not intend to (since he knew he could not) perform" (fn. omitted)); Kuchta v. Allied Builders Corp. 21 Cal.App.3d 541, 549 (Cal.Ct.App.1971), (citing Horn v. Guaranty Chevrolet Motors, 270 Cal.App.2d 477, 484 (Cal.Ct.App.1969)).  In such cases, the plaintiff's claim does not depend upon whether the defendant's promise is ultimately enforceable as a contract. "If it is enforceable, the [plaintiff] ... has a cause of action in tort as an alternative at least, and perhaps in some instances in addition to his cause of action on the contract." Rest.2d Torts, § 530, subd. (1), com. c, p. 65, *cited with approval* Tenzer v. Superscope, 39 Cal.3d 18, 29 (Cal.1985)

**Conclusions of Law**

I. *Misrepresentation (false representation, concealment, or nondisclosure)*

After reviewing the evidence and testimony presented at trial, the Court finds that there was no misrepresentation by Petrovsky that he would pay all the fees that Hebb asserted were owed to him on account of the Hales Litigation, nor was there an omission of an alleged condition precedent to payment.  Hebb presented no direct evidence at trial that Petrovsky misrepresented to Hebb that he would pay full contractual fees.

As stated above, Petrovsky was open with Hebb about his concerns that he had been overbilled.  After Judge Kellegrew ruled as to the reasonable value of Hebb's fees, Petrovsky understandably relied on a judge's opinion of the fair and reasonable value of Hebb's services.  Hebb made much of Petrovsky's payments to him after Hebb purportedly answered all of Petrovsky's billing questions.  Hebb contended that these payments demonstrated that Petrovsky intended to lull him into relying on the promises of future payments.  Instead, these payments show that Petrovsky was doing exactly what he represented he would: pay Hebb for his fair and

-10-

accurate fees.  Contrary to Hebb's assertions, these payments were not made "without further

objection."  Instead, Petrovsky continuously questioned Hebb's billing and did not begin to

question the reasonableness of the fees until after he was able to compare Hebb's work product

with that of Gutierrez.  This led Petrovsky to believe that he was being fleeced by Hebb and he

understandably deferred to the State Court's findings of the reasonableness of Hebb's fees to

confirm what he'd already suspected: the fees for which Hebb billed Debtor were not reasonable,

and thus not fair in Petrovsky's opinion.

Petrovsky attempted to get explanations from Hebb about the bills and what Hebb was

doing on the case.  Hebb never seemed to realize that Ateco was his client and deserved a

detailed billing on a regular basis without all sorts of strange abbreviations and entries making no

sense.  Petrovsky seemed legitimately puzzled why Hebb still did not understand his concerns

after all these years.  He had once had a professional relationship with Hebb and tried not to

insult him, but the more he tried to gracefully remove Hebb from work on the case, the more

Kafkaesque the proceedings became with Hebb chasing him.  In *The Trial*, Joseph K told the

police supervisor arraigning him for some unknown charge, "I require a clear answer to all these

questions, and I'm quite sure that once things have been made clear we can take our leave of each

other on the best of terms." Franz Kafka, *The Trial* (David Wylie trans., Project Gutenberg

eBook 2003) (1925).  Petrovsky, likewise, was in search of simple answers on what fees were

appropriate or how the case was going.  Had Hebb provided appropriate details to Ateco at the

time they were required, or ever really listened to Petrovsky's inquiries and concerns, they may

have indeed ended their relationship on better terms.  It was clear from the emails and actions

taken in the case that the client had lost all faith in the attorney.

II.     *Scienter or knowledge of the falsity of the representation*

Knowing falsity requires that [the defendant] either knew at the time he made the

representations at issue that they were false or recklessly disregarded their truth. Ghomeshi v.

Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir.2010); Gertsch v. Johnson & Johnson, Fin.

Corp. (In re Gertsch), 237 B.R. 160, 167 (B.A.P. 9th Cir.1999). "A representation may be

fraudulent, without [actual] knowledge of its falsity, if the person making it 'is conscious that he

has merely a belief in its existence and recognizes that there is a chance, more or less great, that

1    the fact may not be as represented.'" In re Gertsch, 237 B.R. at 168 (quoting Restatement

2    (Second) of Torts § 526 cmt. e (1977)).

3

4        Hebb's theory of the case is that, sometime in early 2005, Petrovsky concocted a scheme

5    to short Hebb's attorney fees.  Hebb gleaned this belief from an email received in March 2005,

6    wherein Petrovsky stated that he had asked Hebb several times during the previous year for

7    monthly invoices.  It was Hebb's position that Petrovsky never requested monthly billing, and

8    that his alleged reiteration of a request for such was Petrovsky setting up a foundation for this

9    alleged ruse.  This Court has observed repeatedly in the course of three years of litigation that

10   Hebb does not seem to actually hear requests or instructions that are not to his liking.

11        Much of the evidence that Hebb believes supports his position is his emails to Petrovsky

12   that memorialize alleged verbal conversations between the two.  It is telling that there are no

13   reply emails from Petrovsky in the record that show him assenting to any such understandings.

14   In fact, it appears that for part of the time following the Hales trial, Hebb was using a

15   discontinued email address for Petrovsky.  As explained above, Petrovsky did not misrepresent

16   what he intended to pay Hebb.  When Petrovsky made representations to Hebb that he would pay

17   fair and accurate attorney fees, Petrovsky was not lying.  There was no misrepresentation or

18   omission by Petrovsky, and thus there can be no scienter.  "Without a false representation, there

19   can be no fraud under California law."  Vess v. Ciba–Geigy Corp. USA, 317 F.3d 1097, 1105

20   (9th Cir.2003) (citing Hackethal v. Nat'l Cas. Co., 189 Cal.App.3d 1102, 1105

21   (Cal.Ct.App.1987)) (discussing the elements of fraud in California law: false representation,

22   knowledge of its falsity, intent to defraud, justifiable reliance, and damages).

23        Hebb's allegation of fraud by Ateco is even more surprising in light of the billing

24   practices highlighted on his cross-examination.  He refused to acknowledge a $20,000 billing

25   error in his favor, and admitted that he put fees in to the Superior Court at $300 per hour when

26   his agreement with Ateco had been $250 per hour, claiming that was fine to do.  Hebb never

27   once admitted any fault or offered any explanation for some of the most unusual and inadequate

28   timekeeping and billing practices this Court has seen in 15 years of reviewing hundreds of

     professional fee applications.

Hebb's theory that Gutierrez and Petrovsky conspired to defraud him of his fees is also belied by the transparency of their communications regarding the fees and trial discussions. Gutierrez and Petrovsky both regularly copied Hebb on emails discussing fees. Gutierrez never concealed his attempts to collect fees and Hebb had a choice at every step of the way to make the same demands or withdraw from any involvement in the case.

III.    _Intent to induce reliance_

Intent to deceive may be inferred from the totality of circumstances. <u>Citibank (S.D.), N.A. v. Eashai (In re Eashai)</u>, 87 F.3d 1082, 1087 (9th Cir.1996) ("A court may infer the existence of the debtor's [deceptive] intent ... if the facts and circumstances ... present a picture of deceptive conduct by the debtor."). "The debtor's assertions of an honest intent must be weighed against natural inferences from admitted facts." <u>4 Collier on Bankruptcy</u> ¶ 523.08[2][e][ii] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.2013).  Intent to deceive may be inferred if a debtor takes no steps to perform under a contract. <u>Merchs. Nat'l Bank & Trust Co. of Indianapolis v. Pappas (In re Pappas)</u>, 661 F.2d 82, 86 (7th Cir.1981).

To prove his case for fraudulent inducement, Hebb had the burden to prove that Petrovsky intended for Hebb to rely on alleged statements that he would pay Hebb the full amount of the contractual fees.  Hebb has argued that by making periodic payments on account of his fees, and by making representations that additional payments were forthcoming, Petrovsky intended to lull him into continuing to provide legal services in reliance on his alleged promises and actions.  Hebb had ample opportunity to question Petrovsky about what he specifically intended to convey during that time, through both depositions and cross-examination, but Hebb did not elicit any information at trial to support his theory of the case.

It appeared, based on the dialogue between Hebb and Petrovsky, that Hebb was most upset that Petrovsky favored Gutierrez' trial theories.  Hebb also feels Petrovsky did not give him adequate credit for work done or suggestions made.  Hebb's cross-examination did not focus on the issues of fraud and intent, but instead Hebb sought to impeach the credibility of Petrovsky by quizzing him on his memory of mundane, irrelevant details of the Hales Litigation from ten years past.  Hebb did not question Petrovsky about the conversations they had allegedly had that

were memorialized in Hebb's emails.  Petrovsky was credible in his testimony at trial about his intent to pay Hebb for fair and accurate attorney's fees.  Petrovsky was also credible in his testimony about his efforts to understand Hebb's attempted explanations of his billing practices; specifically, Petrovsky requested to see Hebb's hourly timesheets to determine how Hebb was spending his time.  Hebb was unable to provide Petrovsky with the requested documentation because Hebb did not keep contemporaneous hourly time records.  Nevertheless, Petrovsky continued to make progress payments to Hebb right up until Judge Kellegrew's ruling on Hebb's fee application in Ventura Superior Court.  If intent to deceive may be inferred if a party takes no steps to perform under a contract, then the opposite inference is appropriate here.  Petrovsky made a good faith attempt to understand Hebb's odd and erratic bills and was attempting to continue to pay the bill until he started to entertain serious doubts about the value and validity of the services.

Hebb has demonstrated throughout this protracted litigation that he consistently parses language in odd ways to conform facts to his beliefs.  For example, it was Hebb's position that, at no time before February 2008, did Petrovsky dispute any aspect of the invoices submitted to Debtor through August 2005.  See Hebb Deposition, vol. 2, 174:11 – 182:3 (wherein Hebb attempts to deconstruct the meaning of "questioned," "complained," and "was concerned with" as relates to Petrovsky's reaction to his invoices).  This position is completely at odds with the evidence.  See Debtor's Trial Exhibits, Ex. D, F and H.  Instead, the communications demonstrate that Petrovsky repeatedly questioned and requested clarification of Hebb's invoices after Petrovsky did not see the expected drop in fees after hiring Gutierrez.  See id. at Ex. G. Petrovsky clearly conveyed and intended for Hebb to understand that what he would pay would largely be based on Kellegrew's ruling.  See id., Ex. G; GG; and L.

IV.   _Justifiable reliance_

The question of whether or not Hebb's reliance was reasonable is generally a question of fact.  Manderville v. PCG & S Group, Inc., 146 Cal.App.4th at 1498–1499 (Cal.Ct.App. 2007). The issue is "whether the person who claims reliance was justified in believing the representation in light of his own knowledge and experience." Gray v. Don Miller & Associates, Inc., 35 Cal.3d 498, 502–503 (Cal.1984). The plaintiff is not "held to the standard of precaution or of minimum

knowledge of a hypothetical, reasonable man," but "[i]f the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable ... he will be denied a recovery." <u>Alliance Mortgage Co. v. Rothwell</u>, 10 Cal.4th 1226, 1240 (Cal.1995).

Based on the discussions above of the other required elements of this cause of action, Hebb's reliance on any alleged misrepresentation was also not reasonable.  Hebb testified that, sometime after March 2005, Petrovsky told him that he had in the past requested that Hebb bill him monthly.  Hebb felt at the time that Petrovsky's assertion was false and was "suspicious of his intent being to set [him] up."  When Petrovsky did not renew this alleged request, Hebb believed that Petrovsky had "re-thought any deceitfulness…" <u>Declaration of Hebb, in support of trial brief</u>, 6:27 – 7:1-11 (doc. no. 313); <u>Declaration of Hebb in lieu of direct testimony</u>, 3:17-28 – 4:1:6.  On Sept. 30, 2005, Hebb again expressed his doubts about Petrovsky paying his bill and his belief that Gutierrez' comments about the validity of Hebb's attorney's lien was giving Petrovsky "ideas to use in arguing against paying his bill."  <u>Hebb deposition</u>, vol. 2, 179:2-18. Hebb's own reservations about Petrovsky's intentions also undermine any argument about his reliance on Petrovsky's assertions.

If Hebb had any misgivings about whether Petrovsky would pay the alleged contractual fees after the March 2005 communication, those doubts should have been put to rest when Petrovsky balked after he had received the invoices.  Petrovsky also informed Hebb that "I don't want you to do any more legal work on the Ateco file until after the hearing on costs. … Now that I received your bills and had a chance to review some of the billing, I am concerned about your legal costs.  Before you absolutely need to do anything, please consult with me." <u>See Debtor's Trial Exhibits</u>,  Ex. G.

Given the state of the relationship between Hebb and Petrovsky after December 2004, any reliance by Hebb was not justifiable.  In fact, Hebb's continued involvement in the case evidences a denial of reality.  His theory seems to be solely that since Ateco collected money in the Hales litigation, he also should have seen a big payday.  While Petrovsky would have avoided years of litigation had he clearly and unequivocally fired Hebb and demanded the return of his files, his statements and actions would have conveyed to most professionals that the representation had ceased and no further payment would be forthcoming.  Hebb's reliance on

what he believed to be Petrovsky's promises to pay full contractual legal fees, in the light of his own intelligence and information as an attorney with more than 30 years of experience, was manifestly unreasonable.  While Petrovsky was not as forceful as he could have been in his criticism of Hebb's advocacy skills and billing practices, his actions and statements do not rise to the level of fraud.

## Conclusion

For the reasons stated above, the unsecured portion of Claim 4-1 for fraudulent inducement in the amount of $1,087,645, filed by John F.L. Hebb, is disallowed in its entirety. The Court will enter an order concurrently with this Memorandum.  Now that ten years of procedural wrangling have finally ended, a full trial on the merits has demonstrated that there was no basis for the strange odyssey that an officer of the court foisted on Ateco.

The adversary proceeding filed by Ateco against Hebb also sought to determine the validity of this claim.  That issue has been resolved by this ruling and the disallowance of Hebb's claim is a final order.   Additional causes of action for against Hebb for breach of contract, breach of fiduciary duty, professional negligence, fraud and unjust enrichment were also asserted in the adversary complaint.   Those issues were bifurcated in order to first determine whether Hebb was a creditor in this bankruptcy case.  An order will issue for Debtor to explain how it intends to proceed with the remaining issues in the bankruptcy case, as well as its adversary proceeding against Hebb.

###

Date: April 9, 2014

Maureen A. Tighe
United States Bankruptcy Judge